J-A21037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DESIREE LAMARR-MURPHY, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF CHRISTOPHER B. MURPHY, DECEASED; AND BRIANNAH LAMARR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| | : | No. 1846 EDA 2021 |
| v. | : : : | |
| DELAWARE COUNTY MEMORIAL HOSPITAL; PROSPECT DCMH, D/B/A DELAWARE COUNTY MEMORIAL HOSPITAL; AND PROSPECT MEDICAL HOLDINGS, INC. | : : : : : : | |

Appeal from the Judgment Entered August 18, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  180401968

| | | |
|---|---|---|
| DESIREE LAMARR-MURPHY, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF CHRISTOPHER B. MURPHY, DECEASED; AND BRIANNAH LAMARR, | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| | : | No. 1847 EDA 2021 |
| v. | : : : : | |
| CROZER KEYSTONE HEALTH SYSTEM D/B/A CROZER KEYSTONE HEALTH SYSTEM EMERGENCY SERVICES; PROSPECT CROZER, LLC; CKHS, INC. D/B/A CROZER- KEYSTONE HEALTH SYSTEM; RYAN ARNOLD AND KENNETH BROWN, JR. | : : : : : : : : : | |

Appeal from the Judgment Entered August 18, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 171003272

BEFORE: LAZARUS, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED DECEMBER 20, 2023**

This consolidated appeal arises out of a negligence action filed by Desiree Lamarr-Murphy, individually and as administratrix of the Estate of Christopher B. Murphy (Decedent)[1], and Briannah Lamarr (collectively, Appellants).[2] Desiree was Decedent's wife and Briannah was one of his four daughters. Their suit concerns the emergency medical services rendered to Decedent by Appellees, Ryan Arnold, an emergency medicine technician (EMT), and Kenneth Brown, Jr., a paramedic,[3] as well as their employer, Delaware County Memorial Hospital (DCMH) (collectively, Defendants). At the conclusion of an eight-day trial, a jury determined that Arnold was 49% responsible for the harm to Decedent while Decedent himself was 51% liable.

---

[1] We refer to Desiree and the estate of Decedent collectively as "the Estate."

[2] We note the trial court purported to consolidate two underlying cases. Judgment was entered in both cases and Appellants filed a separate notice of appeal at each underlying docket. The appeals were listed consecutively in this Court. Because the trial court only appeared to be using the caption from one trial court docket, this Court issued a rule to show cause order directing the trial court to clarify the correct captions. The trial court responded, providing the correct captions. We then entered orders directing this Court's Prothonotary to correct the captions on this Court's dockets.

[3] We refer to Arnold and Brown collectively as "DCMH EMS."

Based on the jury's verdict and its denial of post-trial motions, the court entered judgments in favor of Defendants on August 18, 2021. On appeal, Appellants raise the following challenges: (1) the trial court erred in finding that Defendants were immune from liability under the Pennsylvania Emergency Response Provider and Bystander Good Samaritan Civil Immunity Act[4] (Good Samaritan Act); (2) the court erred in submitting the issue of comparative negligence to the jury; (3) the verdict was against the weight of the evidence; and (4) the court erred in granting a compulsory nonsuit for Briannah's claim of negligent infliction of emotion distress (NIED). Based on the following, we affirm.

## I.    Facts and Procedural History

The relevant facts and procedural history of this involved case are gleaned from the certified record. Where there are factual disputes between the parties, we will highlight them.

At the time of the April 24, 2016, incident, Decedent was 39 years old. *See* Complaint, 10/26/17, at ¶ 4. He had a prior history of blood clots in his legs, otherwise known as a deep venous thrombosis, and was hospitalized in 2005 for treatment. *See* N.T., 6/15/21, at 116. He did not have a reoccurrence of a blood clot following that hospitalization. *Id.* at 122.

---

[4] *See* 42 Pa.C.S. § 8332.

During the week prior to the event at issue, Decedent complained of pain in his right leg due to a flare-up of gout. *See* N.T., 6/14/21, at 96. Desiree testified that Decedent would have flare-ups two to three times a year. N.T., 6/15/21, at 117. Decedent decided to stay home from work, as a United States Postal Service employee, that week as he had leg and knee pain and was having difficulty walking. *See* N.T., 6/14/21, at 173; N.T., 6/15/21, at 118. On Monday, April 18, 2016, Desiree first noticed that Decedent started using a crutch. N.T., 6/15/21, at 123. At one point, Desiree told Decedent to go "see his gout doctor[,]" but he did not "listen[.]" *Id.* at 124-25.. On Friday, April 22, 2016, his daughter, Briannah, also suggested Decedent go to the doctor based on his symptoms. *See* N.T., 6/14/21, at 174. That night, he was still able to prepare dinner and was singing and dancing. *See* N.T., 6/15/21, at 123-24.

On the morning of Sunday, April 24, 2016, while at home on Sellers Avenue, Upper Darby Township, Decedent began having difficulty breathing. *See* N.T., 6/14/21, at 101. One of his daughters, Imani Lamarr, heard a "thud" and observed her father laying partly on the basement steps. *Id.* at 99, 101. She then called 9-1-1[5] and DCMH EMS was dispatched at approximately 11:16 a.m. to the residence. Arnold indicated "the call came

---

[5] Imani testified that she told the 9-1-1 operator that her father had fallen, had gout, and could not get up. *See* N.T., 6/14/21, at 102.

through . . . as a . . . [basic life support (BLS)] call[,]" which is considered "a less emergent situation than [an] advanced life support[(ALS) call.]" N.T., 6/16/21, at 13.

DCMH EMS arrived on the scene at approximately 11:17 a.m. *See* N.T., 6/16/21, at 13. At approximately 11:21 a.m., they moved Decedent from the steps to the kitchen floor. *See* N.T., 6/14/21, at 103; N.T., 6/22/21, at 31. They then placed him on a stretcher and transported him to the ambulance.[6] *See* N.T., 6/14/21, at 132-33. Briannah recalled Imani speaking with DCMH EMS for four to five minutes as they asked her questions about Decedent's prior medical history.[7] *See id.* at 104-05, 134. Imani also called Desiree, who provided certain information regarding Decedent to relay to the responders. *See id.* at 106. Desiree was "without a doubt positive" she shared that Decedent presently was suffering from gout and a history of a blood clot, but did not understand why he could not breathe. *See* N.T., 6/15/21, at 128. She then left her part-time job to meet them at the hospital. *Id.*

_____

[6] Arnold described the vehicle as a "mobile intensive care unit" or "MICU[.]" N.T., 6/16/21, at 9. The MICU is not equipped with heparin, a blood thinner, or tissue plasminogen activator (TPA), a clot buster." *Id.* at 10. These drugs are not carried on ambulances in the Commonwealth of Pennsylvania. *See* N.T., 6/22/21, at 26.

[7] Briannah did not remember any discussion regarding deep venous thrombosis, clotting, or a pulmonary embolism, but did hear her sister and DCMH EMS speaking about Decedent's gout. *See* N.T., 6/14/21, at 176.

Based on Decedent's status after evaluation, Arnold suspected a pulmonary embolism. **See** N.T., 6/16/21, at 15. He also stated there are no specific embolism protocols, but there are for "seriously ill appearing patients[.]" **Id.** at 17, 19. In his EMS report, Arnold described Decedent's condition as follows: (1) swollen right knee; (2) pale skin; (3) sweating heavily; (4) rapid breathing or tachypneic; (5) highly anxious; (6) decreased lung sounds in all fields bilaterally; and (7) respiratory distress. **See id.** at 45-47.

Meanwhile, Decedent told the responders he was having trouble breathing as they placed "leads on his chest" to conduct an electrocardiogram (EKG) test. **See** N.T., 6/14/21, at 134; N.T., 6/16/21, at 25. At approximately 11:24 a.m., they also provided him with several liters of oxygen after a "capillary refill [was] done on [his] pinkie which show[ed] there was a delayed capillary response [and Decedent] was deoxygenated." N.T., 6/17/21, at 144, 241; N.T., 6/22/21, at 31.

As Crozer EMS was moving Decedent outside towards the ambulance, Briannah ran into the home to find her father's wallet before leaving. **See** N.T., 6/14/21, at 135.

Arnold and Brown did not initially ventilate Decedent because his "breathing was adequate," and placed him in the ambulance for transport at approximately 11:25 a.m. **See** N.T., 6/16/21, at 25; N.T., 6/22/21, at 32. For the next several minutes, Arnold placed a LIFEPAK defibrillator monitor, a

peripheral IV/18-gauge angio catheter, and a 12-lead EKG monitor on Decedent.[8]  **See** N.T., 6/22/21, at 33-35.  They also gave Decedent chewable baby aspirin at approximately 11:30 a.m.[9]  **Id.** at 36-37.  Two minutes later, Arnold took a set of Decedent's vital signs, and noted that Decedent appeared to "calm down after [the] aspirin administration" and his respiratory rate decreased so Arnold gave him a "normal saline, 500 milliliter via IV drip."  **Id.** at 37.  Arnold stated that Decedent's rapid "heart rate . . . decreased by two beats a minute.  The [oxygen saturation] started out with 88 percent [and then was] 91 percent.  [Decedent was] moving in the right direction in terms of oxygen saturation."  **Id.** at 38.

Arnold indicated he made the decision to take Decedent to Lankenau based on Decedent's "chest pain and shortness of breath" and because "[h]is signs and symptoms were extremely consistent not only with pulmonary embolism but also extremely consistent with . . . acute coronary syndrome[.]" N.T., 6/16/21, at 55.  Moreover, Lankenau had a primary percutaneous coronary intervention (PPCI) center and an extracorporeal membrane oxygenation (ECMO) machine which led Arnold to "believe that Lankenau

_____

[8] The information acquired from the 12-lead EKG was transmitted to Lankenau Medical Center (Lankenau) prior to their arrival, which alerted the emergency department and mobilized their response team.  **See** N.T., 6/22/21, at 35-36.

[9] Briannah testified that when Crozer EMS gave her father baby aspirin, he spit it out based on his difficulty with breathing.  **See** N.T., 6/14/21, at 133.

would be able to take care [of him] either way." *Id.* at 56. DCMH did not have those machines. *Id.* at 58.

The ambulance departed at approximately 11:34 a.m. for Lankenau. *See* N.T., 6/16/21, at 14. Briannah went with her father to the hospital.[10] *See* N.T., 6/14/21, at 107. As will be discussed below, the ambulance traveled a different route than Desiree and Briannah would have taken to get to Lankenau, as there was a "difference of ten traffic lights."[11] N.T., 6/15/21, at 121. Briannah also testified that Crozer EMS stopped at red lights and stop signs *en* route to the hospital. *See* N.T., 6/14/21, at 139. Arnold indicated the ride from Decedent's home to Lankenau generally should take approximately six to eight minutes. *See* N.T., 6/16/21, at 16. Brown was

_____

[10] Briannah noted that initially the ambulance's lights and sirens were not activated but were later turned on at the entrance of Lankenau. *See* N.T., 6/14/21, at 135-36, 138. On cross-examination, Briannah acknowledged that she made this assumption because she did not see Brown "manipulating the switches[,]" but she also could not see the lights on top of the truck or their reflections on buildings and stop signs. *Id.* at 185. A neighbor, Robert Fedirko, testified that he believed the ambulance's lights were on when it pulled away from Decedent's residence. *Id.* at 209. Brown averred that lights were activated and the sirens were used intermittently *via* the horn. *See* N.T., 6/16/21, at 93.

Both daughters testified that they did not observe DCMH EMS act with any "urgency" regarding their handling of Decedent. *See* N.T., 6/14/21, at 106-07, 134.

[11] Desiree testified the course she would have taken was three miles in distance, and the route taken by DCMH EMS was 3.7 miles — a difference of approximately 3,700 feet. *See* N.T., 6/22/21, at 100-101, 108.

familiar with the neighborhood based on living there for 26 years. *Id.* at 79. He intimated that he did not make a U-turn on Sellars Avenue to get to State Road, which would have been the most direct route, because "it would take a three to four point with an unrestrained person[, Arnold,] in the back tending to an ill patient."[12] *Id.* at 85-86.

At approximately 11:36 to 11:38 a.m., when they were three to four minutes away from Lankenau, Decedent's respiratory rate increased suddenly and he went into cardiopulmonary arrest. *See* N.T., 6/16/21, at 34, 78; N.T., 6/22/21, at 39. Arnold ordered Brown to stop the vehicle so that he and Brown could administer cardiopulmonary resuscitation (CPR). *See* N.T., 6/14/21, at 153; N.T., 6/16/21, at 34. Briannah indicated they were stopped for approximately 15 minutes as she watched them give Decedent chest compressions and oxygen. *See* N.T., 6/14/21, at 153, 155. While the two responders were administering compressions and giving epinephrine, an adrenaline medication, their supervisor, Jerome Casey, arrived to assist at approximately 11:44 a.m. *See id.* at 155; N.T., 6/22/21, at 43. Casey then assessed the situation and at 11:46 a.m., they gave Decedent another milligram of epinephrine. *See* N.T., 6/22/21, at 43. At 11:48 a.m., they

---

[12] Brown stated that the ambulance at issue is 24 feet in length, it was parked perpendicularly on Sellers Avenue, and there would be approximately a foot from the front bumper to the curb — making a U-turn precarious. *See* N.T., 6/16/21, at 99.

performed an orotracheal intubation of Decedent. *Id.* at 44. At 11:50 a.m., they conducted another rhythm check on Decedent and he was "in asystole" so they restarted compressions while giving him more epinephrine. *Id.* at 44-45. They then resumed transporting him to Lankenau. *See id.* at 45. The ambulance arrived at the Lankenau's emergency department at 11:56 a.m. *See* N.T., 6/16/21, at 15.

Approximately 39 to 40 minutes had elapsed from the time DCMH EMS arrived at Decedent's home to when they arrived at the hospital.[13] *See* N.T., 6/16/21, at 77. Decedent was pronounced dead on arrival. The following day, an autopsy examination was conducted and Decedent's cause of death was "determined to be acute pulmonary thromboembolism due to deep venous thrombosis."[14] N.T., 6/15/21, at 36.

Appellants filed a complaint and amended complaint in October 2017, and March 2018,[15] respectively, in which they brought a suit against Arnold,

_____

[13] In his deposition which was read to the jury, Supervisor Casey indicated that time period was "reasonable" for someone who is exhibiting signs of a pulmonary embolism to get to the hospital. N.T., 6/16/21, at 112.

[14] The medical examiner (ME) described the size of the embolus as "large." N.T., 6/15/21, at 44. The ME also noted Decedent's toxicology report revealed findings of synthetic opiates (hydrocodone) and Delta-9 Carboxy tetrahydrocannabinol (THC), which is a non-active ingredient in marijuana. *Id.* at 41, 46. Nevertheless, the ME stated these toxins were not a contributing factor to Decedents' death. *Id.* at 41.

[15] During this time Crozer Keystone and DCMH EMS filed preliminary objections, which were overruled without prejudice on March 2, 2018. *See* *(Footnote Continued Next Page)*

Brown, Defendant Crozer Keystone Health System d/b/a Crozer Keystone Health System Emergency Medical Services, which operates on behalf of Defendant Prospect Crozer, LLC, and Defendant CKHS, Inc. d/b/a/ Crozer-Keystone Health System.[16]  In the amended complaint, they raised the following causes of action:  (1) negligence and gross negligence against all defendants by Estate; (2) wrongful death against all defendants by Estate; (3) survival action by Estate; and (4) NIED against all defendants by Briannah.

Arnold, Brown, and Crozer Keystone filed an answer and new matter, and alleged, in relevant part, that Arnold and Brown were employees of DCMH.[17]  *See* Answer with New Matter, 4/13/18, at 4-5.  They denied any negligence or gross negligence on their part, and asserted that all medical care provide by DCMH EMS met the applicable standards of care.  *Id.* at 5-11.  They also denied Briannah's NIED allegations.  *Id.* at 11-12.  In their new matter, they alleged, in pertinent part, that Appellants' claims were barred by

---

Order, 3/2/18.  The court also granted Appellants leave to file an amended complaint.  *See id.*

[16] We will refer to Crozer Keystone Health System d/b/a Crozer Keystone Health System Emergency Medical Services, which operates on behalf of Defendant Prospect Crozer, LLC, and Defendant CKHS, Inc. d/b/a/ Crozer-Keystone Health System collectively as "Crozer Keystone."

[17] Defendants stated that CKHS EMS is a fictitious name owned by DCMH. *See* Defendants' Answer with New Matter, 4/13/18, at 3.  They denied that Crozer Keystone was responsible for the ambulance that transported Decedent on April 24th.  *Id.*

the Pennsylvania Comparative Negligence Act,[18] and Defendants were immune from liability pursuant to the Good Samaritan Act. *Id.* at 13, 15.

On June 22, 2018, Appellants filed a second complaint against DCMH, Prospect DCMH, LLC, and Prospect Medical Holdings, Inc. alleging it is responsible for the ambulance that transported Decedent. *See* Complaint, 6/22/18, at ¶ 9. They further alleged that "DCMH EMS inexplicably stopped the ambulance on the side of the road. . ., rather than activating lights and sirens and speeding to Lankenau Hospital while [CPR] was initiated by the non-driving EMS employee." *Id.* at ¶ 30. Additionally, they claimed:

> Despite the severity and emergent nature of [Decedent]'s collapse, dire physical condition, and cardiopulmonary arrest, which was readily known and observable by DCMH EMS and its employees or agents, DCMH EMS did not: (a) provide immediate and necessary life-saving first aid; (b) properly perform CPR for an appropriate amount of time; (c) provide immediate anticoagulation; and/or (d) promptly and emergently transport [Decedent] to the nearest medical facility.

*Id.* at ¶ 37. Like their first complaint, they raised the following causes of action: (1) negligence and gross negligence against all defendants by Estate; (2) wrongful death against all defendants by Estate; (3) survival action by Estate; and (4) NIED against all defendants by Briannah. *Id.* at ¶¶ 45-64.

---

[18] *See* 42 Pa.C.S. § 7102, *et seq.*

DCMH and the related parties[19] filed an answer and new matter, denying

Appellants' allegations and raising defenses, in relevant part, related to the

Comparative Negligence Act and the Good Samaritan Act.  Answer, 8/9/18, at

15, 18.

On August 10, 2018, the trial court consolidated the two matters based

on a motion filed by Appellants.  On September 3, 2019, Defendants filed a

motion for summary judgment, alleging that they are immune from liability

under the Good Samaritan Act, Appellants failed to establish a *prima facie*

_____

[19] Notably, with respect to the relationship of the defendant parties, they averred the following:

> Prospect DCMH, LLC, did not transact business in the Commonwealth of Pennsylvania during the relevant times alleged in [Appellants'] Complaint.  On January 8, 2016, Crozer-Keystone Health System, a not for profit corporation, entered into an Asset Purchase Agreement with Prospect Medical Holdings, Inc., and Prospect DCMH, LLC, wherein substantially all of the assets of Crozer-Keystone Health System would be acquired by Prospect Crozer, LLC.  Pursuant to the asset purchase agreement, Prospect Crozer, LLC, did not assume the liabilities of Crozer-Keystone Health System, a not for profit corporation, for claims or potential claims arising out of events reported prior to July 1, 2016, including medical professional liability claims.  Prospect Crozer, LLC, and Crozer-Keystone Health System, a not for profit corporation, closed on the acquisition of certain assets of Crozer-Keystone Health System, a not for profit corporation, and its subsidiaries on July 1, 2016.  Therefore, Answering Defendant Prospect DCMH, LLC was not transacting business relative to the claims raised by [Appellants] or involved in the medical care and/or treatment of . . . Decedent during the relevant times alleged in Plaintiffs Complaint. . . .

Answer, 8/9/18, at 3.

case of gross negligence or intent to harm. *See* Defendants' Motion for Summary Judgment, 9/3/19, at 14-36. They also claimed Crozer Keystone Health System d/b/a Crozer Keystone Health System Emergency Medical Services, Prospect Crozer, LLC, and CKHS, Inc. d/b/a/ Crozer-Keystone Health System, and Prospect Medical Holdings, Inc. are not proper parties to the instant action. *Id.* at 36-38. One month later, Appellants filed a response to Defendants' motion for summary judgment. On October 9, 2019, the trial court denied Defendants' motion for summary judgment.[20]

The parties then exchanged multiple motions in *limine* and responses. Related to this appeal, the trial court found that the Good Samaritan Act applied, and consequently, Appellants were required to prove gross negligence as to all defendants and all claims. *See* N.T., 6/14/21, at 6, 10, 21-23.

The matter proceeded to a jury trial on June 14, 2021. Two days later, Arnold, Brown, and DCMH filed a motion for compulsory nonsuit, alleging that under the Good Samaritan Act, Appellants were required to prove gross negligence and they failed to do so, offering only evidence of ordinary negligence. *See* Defendants' Motion for Compulsory Nonsuit, 6/16/21, at ¶¶ 6-19. Appellants filed a written response one day later. The trial court

_____

[20] During this time, on October 1, 2019, the parties entered a joint stipulation, which provided that all claims against Crozer Keystone and Prospect Medical Holdings, Inc. were dismissed with prejudice. *See* Stipulation of Dismissal of Less Than All Defendants and to Amend Complaint, 10/1/19, at ¶ 1. The stipulation also amended the caption. *Id.* at ¶ 2.

granted the nonsuit against Briannah for the NIED cause of action, and in favor of DCMH on the issue of corporate negligence. *See* N.T., 6/17/21, at 29; N.T., 6/14/21, at 7. The court denied the motion for compulsory nonsuit as to all other claims. At trial, Defendants argued that Decedent's failure to obtain medical care for his knee pain during the week prior to the incident at issue constituted comparative negligence. *See* N.T., 6/14/21, at 90-91. Appellants objected and argued that because there was purportedly no expert testimony on the issue of factual causation between Decedent's knee pain and his death. *See* N.T., 6/22/21, at 127-28. The court overruled Appellants' objection and provided the jury with standard jury instructions on comparative negligence. *See* N.T., 6/21/21 (Closing Arguments), at 4.

On June 22, 2021, the jury found the following: (1) Arnold was grossly negligent in his care and treatment of Decedent; (2) Brown was not grossly negligent in his care and treatment of Decedent; (3) Arnold's grossly negligent act was a factual cause of harm to Decedent; (4) Decedent was negligent and his ordinary negligence was a factual cause of the harm he sustained; and (5) Arnold was 49% negligent while Decedent was 51% negligent. *See* Verdict Sheet, 6/22/21, at 1-2 (unpaginated).

On June 25, 2021, at both dockets, Appellants filed motions for post-trial relief, claiming: (1) they were entitled to a judgment notwithstanding the verdict on the jury's finding of comparative negligence as to Decedent; (2) it was improper to charge the jury on comparative negligence; (3) the Good

Samaritan Act did not apply to the case; (4) the court's definition of gross negligence was in error; and (5) multiple other trial court errors. **_See_** Appellants' Motions for Post-Trial Relief, 6/25/21, at 1-10 (unpaginated). Defendants filed a response. On July 27, 2021, the trial court entered orders, at both dockets, denying Appellant's post-trial motions. On August 18, 2021, judgments were entered on behalf of Arnold, Brown, and DCMH. This consolidated appeal followed.[21]

## II.    Issues and Standard of Review

Appellants raise the following issues for our review:

I. Does the "Emergency response provider and bystander good Samaritan civil immunity" statute apply to a private hospital and its EMS crew, where the statute: (a) covers only "persons", "agencies" and "authorities", but not hospitals; (b) excludes "hospitals emergency facilities and related personnel"; and (c) excludes harm caused by the "operation or use" of a vehicle?

II. Should the trial court have submitted the defense of comparative negligence to the jury where Defendants failed to present expert testimony proving that [Appellants'] decedent's failure to seek medical care for his knee pain was a factual cause of his death from a pulmonary embolism in his lung a week later?

III. Whether a jury's allocation of fault is against the weight of the evidence where it assigns 49% of the fault to the party found to be culpable of gross negligence, and 51% of the fault to the party found to be culpable of ordinary negligence?

IV. Should the trial court have granted a compulsory nonsuit on [Appellant] Briannah Lamarr's claim for negligent infliction of

---

[21] Appellants complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court issued a Pa.R.A.P. 1925(a) opinion on March 2, 2022.

emotion distress where the evidence showed that she contemporaneously observed grossly negligent conduct that caused her father's death?

Appellants' Brief at 5-6.

Because Appellants' claims largely stem from the denial of their post-trial motions, we emphasize this Court's review of a trial court's denial of a motion for post-trial relief is limited:

> Our review is limited to determining whether the trial court abused its discretion or committed an error of law. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. If the alleged mistake concerned an error of law, we will scrutinize for legal error. On questions of law, our standard of review is *de novo* and our scope of review is plenary.

*Zaleppa v. Seiwell*, 9 A.3d 632, 635 (Pa. Super. 2010) (citations & quotation marks omitted).

### III. Good Samaritan Act

In their first argument, Appellants claim the trial court improperly applied the Good Samaritan Act to the present case. *See* Appellants' Brief at 31. They argue that DCMH is not covered under the language of the statute "because: (1) a hospital cannot be a 'person' nor an 'emergency response provider' as defined in the statute, and (2) the statute expressly excludes 'hospital emergency facilities' from protection under the statute." *Id.*

The Good Samaritan Act provides, in pertinent part:

**(a) General rule.** — Any person, including an emergency response provider, whether or not trained to practice medicine, who in good faith renders emergency care, treatment, first aid or

- 17 -

rescue at the scene of an emergency event or crime, or who moves the person receiving such care, first aid or rescue to a hospital or other place of medical care, shall not be liable for any civil damages as a result of rendering such care, except in any act or omission intentionally designed to harm or any grossly negligent acts or omissions which result in harm to the person receiving emergency care or being moved to a hospital or other place of medical care.

\*     \*     \*

**(c) Exception*.* —** This section shall not relieve a driver of a vehicle, including an ambulance or other emergency rescue vehicle, from liability arising from an operation or use of such vehicle pursuant to subsection (a).

**(d) Definition*.* —** For the purposes of this section, the term "emergency response provider" includes Federal, State and local emergency public safety, law enforcement, emergency response, emergency medical services personnel, response teams, agencies and authorities, excluding hospital emergency facilities and related personnel.

42 Pa.C.S. § 8332.[22]

Returning to Appellants' argument, they claim that the statute "defines 'emergency response provider' in a manner that is designed to protect public officials such as fire and police personnel that respond to an emergency scene [and it] was also intended to protect private 'persons' "(*i.e.*, good Samaritans) who happen upon an emergency scene, including those that have medical training." Appellants' Brief at 32. They claim, "No reasonable reading of the

_____

[22] Effective September 9, 2022, Subsection (d) was deleted and the definition of "emergency response provider" was moved to a newly created Subsection (e) that set forth certain definitions, including "emergency response provider." The definition is essentially the same as the prior subsection.

statute supports the trial court's conclusion that it protects a private hospital from liability arising out of the negligence of its employees." *Id.* at 32-33. Appellants suggest that the Good Samaritan Act is not facially applicable because DCMH "is not a 'person' or 'agency' or 'authority[.'"] *Id.* at 33. Moreover, they allege that "[i]f the statue were intended to protect private hospitals, the legislature would have stated as much[,]" but the statute "does not" include hospitals in its definition of emergency response providers, and, in fact, even "excludes 'hospital emergency facilities.'" *Id.*

Additionally, Appellants contend that even if Arnold and Brown were entitled to immunity, "their immunity would not benefit" DCMH. Appellants' Brief at 33. Relying on ***Regester v. County of Chester***, 797 A.2d 898, (Pa. 2002), they argue that "DCMH is not immune from liability for harm caused by its own ordinary negligence, or by the ordinary negligence that may be imputed to it through the conduct of its agents." Appellants' Brief at 34.

Appellants further maintain that Arnold and Brown are not protected under the Good Samaritan Act because the statute states "an 'emergency response provider' is entitled to immunity does not include 'hospital emergency facilities and related personnel.'" Appellants' Brief at 35 (emphasis omitted), *citing* 42 Pa.C.S. § 8332(d). They allege Arnold and Brown fall under the category of "related personnel." *Id.* Moreover, Appellants complain that Brown is not entitled to immunity for his operation or use of the ambulance because he "failed to activate the ambulance's lights and sirens; took the

wrong route to the hospital; stopped and waited at all red lights; failed to use his horn; and missed a turn." *Id.* at 36. They state, "All these acts and omissions involved the 'operation or use' of a vehicle, rather than 'care, treatment, first aid or rescue.'" *Id.*

Lastly, Appellants argue that in its analysis, the trial court improperly "relied upon another statute for 'guidance', the Emergency Medical Services System Act ('EMSSA')[23 and] pieced together different definitions from EMSSA to conclude that an ambulance cannot be considered an 'emergency response facility.'" Appellants' Brief at 37. Appellants insist their argument focused on DCMH not the ambulance and the "court erroneously focused only on whether the ambulance qualified as a 'hospital emergency facility' without addressing the broader issue of whether . . . DCMH was one." *Id.* at 38 (emphasis omitted).

This issue requires us to interpret the Good Samaritan Act, which implicates the principles of statutory construction. "Since 'the construction of

_____

[23] The EMSSA provides, in pertinent part:

> No EMS agency, EMS agency medical director or EMS provider who in good faith attempts to render or facilitate emergency medical care authorized by this chapter shall be liable for civil damages as a result of an act or omission, absent a showing of gross negligence or willful misconduct. This paragraph shall also apply to students enrolled in approved courses of instruction and supervised pursuant to rules and regulations.

35 Pa.C.S. § 8151(2).

the language of the Act is a question of law,' our standard of review is *de novo*." ***Stop Blight Inc. v. Dinardo***, 303 A.3d 516, 519 (Pa. Super. 2023) (citation omitted).

We are also mindful of the following principles:

> [t]he Statutory Construction Act directs that the object of all interpretation and construction of statutes is to ascertain and effectuate the legislature's intent. 1 Pa.C.S. § 1921(a); ***Chanceford Aviation Properties, LLP v. Chanceford Twp. Bd. of Supervisors***, 592 Pa. 100, 923 A.2d 1099, 1104 (2007). Generally, the best indicator of legislative intent is the plain language of the statute. ***Walker v. Eleby***, 577 Pa. 104, 842 A.2d 389, 400 (2004).

> In construing statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. § 1903(a). When the words of a statute are clear and unambiguous, there is no need to look beyond the plain meaning of the statute "under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); ***Commonwealth v. Conklin***, 587 Pa. 140, 897 A.2d 1168, 1175 (2006). Only "[w]hen the words of the statute are not explicit" may a court resort to the rules of statutory construction, including those provided in 1 Pa.C.S. § 1921(c). ***Chanceford***, 923 A.2d at 1104.

> A statute is ambiguous when there are at least two reasonable interpretations of the text under review[.] ***See Delaware Cnty. v. First Union Corp.***, 605 Pa. 547, 992 A.2d 112, 118 (2010). Moreover, "[s]tatutes *in pari materia* shall be construed together, if possible, as one statute." 1 Pa.C.S. § 1932. Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1).

> ***Warrantech Consumer Prods. Servs., Inc. v. Reliance Ins. Co. in Liquidation***, 626 Pa. 218, 96 A.3d 346, 354-55 (Pa. 2014) (italics added).

***Turnpaugh Chiropractic Health & Wellness Ctr., P.C. v. Erie Ins. Exch.***,
297 A.3d 404, 417-18 (Pa. Super. 2023) (paragraph breaks added).

A review of the record reveals the following. In May of 2021, Defendants filed a motion in *limine* supporting the application of the Good Samaritan Act and alleged that the law "governs all aspects of [Appellants'] claims and theories in this case, such that 'gross negligence' is the applicable standard for liability." Motion in *Limine* of Defendants Supporting Application of the Emergency Response Provider and Bystander Good Samaritan Civil Immunity Law, 5/26/21, at 2. Appellants opposed the motion, claiming:

> There are exceptions to the blanket use of the gross negligence standard in the case. [Appellants] allege that the Defendants were negligent in the use and/or operation of the vehicle which is a stated exception. Furthermore, prior case law and the plain wording of the statute exempt hospitals and emergency facilities from the qualified immunity.

Appellants' Opposition to the Motion in *Limine* of Defendants Regarding the Application of the Emergency Response Provider and Bystander Good Samaritan Civil Immunity Law, 6/7/21, at ¶ 6.

On June 14, 2021, the trial court initially granted Defendants' motion in *limine* and then heard the following argument on the applicability of the Good Samaritan Act:

> [Appellants' Counsel:] Our Good Samaritan Act that was in place at the time of the case does have a vehicle exception in the [***Regester***] case. It was rejected.
>
> The claim was that the EMTs, little bit different factually, went the wrong way, got lost en route to the patient's house. By

the time they got to the patient's house, he was already in full blown cardiac arrest.

Our case is different. Our case is, when they arrived at . . . Sellers Avenue, [Decedent] was still alive and breathing and although the [*Regester*] case rejected the vehicle exception proffered by the plaintiff, there's an interesting distinction in the vehicle exception act that was in place at the time of the [*Regester*] case.

[T]he Supreme Court in that case said operation of the vehicle means if you get lost it doesn't mean if you get into an accident we all understand that to be, but in the motor vehicle exception in place for this case, they added some words. It's operation or use. It's no longer mere operation of the vehicle.

Our position is that the failure to use lights and sirens is a use of the vehicle, and if the jury were to believe that that was a negligent omission that our case would, therefore, fall within that vehicle exception. That's the vehicle exception.

As to the other portion of the acts, the act states under the general rule any person including an emergency response provider and the "any person" language at least as far as the [*Regester*] case stated they rejected that the any person also applies to the corporate entity in the [*Regester*] case and said that it specifically does not apply because it didn't say any hospital, a person, any corporation.

We have [DCMH] as a stand alone defendant in this case, so I would submit to the Court that when this immunity statute reads any person, it does not include [DCMH]. Arguably it applies to drivers and the paramedic.

Furthermore, when you look at the definition of emergency response provider, it specifically excludes hospital emergency facilities and related personnel.

**It's our view that [DCMH] is providing, in essence, a mobile ER. That's what the legislature was referring to when they said excluding hospital emergency facilities and related personnel**.

\* \* \*

- 23 -

[Defendants' Counsel]: . . . The [*Regester*] case is not applicable here. The [*Regester*] case dealt with a completely different statute of the Emergency Medical Services Act which actually was repealed by the Pennsylvania state legislature. It has no precedential value.

The [*Regester*] case, thankfully[,] Your Honor[,] there is a case from [Judge] Massiah-Jackson in the case of [*Kronfeld v. Sugarhouse HSP Gaming, L.P.*, 2014 WL 12862634 (Pa. Com. Pl. Dec. 9, 2014)[24]]. This is a case that held that the Good Samaritan Act grants immunity to any person, and they define any person as, quote, a corporation, partnership or limited liability company.

This Court can also take guidance from 35 Pa.C.S. [§] 8151 stating that an EMS or medical command are entitled to gross medical standard as well. DCMH is entitled to protection since the only connection is that of vicarious liability. In order to get to DCMH, you have to prove gross negligence between the two individual providers.

Your Honor, I think you're on the right track when you ordered that gross negligence standard applied to all defendants and all claims.

Now, to the vehicle exception standard, . . . I think it's really important to read it in context, Section 8332(b) which provides that any person who moves the person receiving such care, first aid or rescue to a hospital or other place of medical care shall not be liable for any civil damages. Anybody rendering EMS care or moves a patient to a hospital is not liable for civil damages.

The vehicle use exception . . . has only been applied in a couple cases cited in our brief. Those instances where the vehicle exception was actually applied were instances where the

---

[24] We note this case involved a different subsection of the Statutory Construction Act. **See** 1 Pa.C.S. § 1991. Moreover, we are not bound by the decisions of courts of common pleas. **See Jamison v. Concepts Plus, Inc**., 552 A.2d 265, 267 (Pa. Super. 1988).

ambulance was driven carelessly, struck a car or struck a pedestrian. That's not the case here.

The argument that [Brown] stopped and pulled over to perform CPR, took too long to the hospital, drove too slowly, stopped at stop lights, stop signs, didn't use lights and sirens, that's not the purpose of the vehicle use exception[.]

Those are all emergency transport care decisions informed and directed by the condition of the patient as it exists at that particular time. That's a care decision.

If anything, it's a safe operation of the vehicle, going too slow, stopping at stop signs. [The] ambulance must abide by rules of the road. That includes abiding by speed limits and stop signs, stop lights.

I would respectfully submit to you that the gross negligence standard applies to all claims and to all defendants, and that includes DCMH.

N.T., 6/14/21, at 18-23 (emphasis added). The trial court confirmed that its ruling stood. *Id.* at 23.

In its Rule 1925(a) opinion, the trial court explained that because the phrase, "hospital emergency facilities," was not defined by the Good Samaritan Act, it looked to the EMSSA and related definitions.[25] Trial Ct. Op.,

---

[25] Under the EMSSA, a "facility" is a "physical location at which an entity operates a health care facility licensed under Federal or State law." 35 Pa.C.S. § 8103. "Hospital" is defined, in relevant part, as "[a]n institution having an organized medical staff that is primarily engaged in providing to inpatients, by or under the supervision of physicians, diagnostic and therapeutic services or rehabilitation services for the care or rehabilitation of injured, disabled, pregnant, diseased, sick or mentally ill persons." *Id.* Additionally, "emergency" is defined as:

*(Footnote Continued Next Page)*

3/2/22, at 4-5.  The trial court further pointed out that the Good Samaritan Act extends to "[a]ny person . . . who moves the person receiving such care[.]" *Id.* at 6, *citing* 42 Pa.C.S. § 8332(a).  Based on these definitions, the court found:

> According to [Appellants], the "statute does not apply to [their] claims of negligent operation of the mobile intensive care unit (failing to use lights and sirens, taking the wrong route), because the statute explicitly excludes conduct related to the "operation and use" of the emergency vehicle[.]
>
> To find in favor of [Appellants] on this issue, the court must broaden the definition of "use" to include what the appellate court previously labeled as "ambulance service."  The court declined.  The "failing to use lights and sirens" and "taking the wrong route" do not amount to the negligent operation and/or use of an ambulance and the exception does not apply.

Trial Ct. Op. at 6-7 (footnotes omitted).

---

> A physiological or psychological illness or injury of an individual, such that a prudent layperson who possesses an average knowledge of health and medicine could reasonably expect the absence of immediate emergency medical services to result in:
>
> (1) placing the health of the individual or, with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy;
>
> (2) serious impairment of bodily functions; or
>
> (3) serious dysfunction of a bodily organ or part.

*Id.*  An "ambulance" is considered a "ground, water or air vehicle which is maintained or operated for the purpose of providing emergency medical services to and transportation of patients." *Id.*

At the outset, we recognize that there is very limited case law addressing the Good Samaritan Act. Moreover, Appellants' suggestion that DCMH provided "a mobile ER[,]" meaning its ambulance constituted a mobile emergency room, is a novel consideration. **See** N.T., 6/14/21, at 20.

We now turn to the plain language of the statute. The general rule is that "[a]ny person, including an emergency provider, . . . shall not be liable for any civil damages as a result of rendering such care, except in any act or omission intentionally designed to harm or any grossly negligent acts or omissions which result in harm to the person receiving emergency care or being moved to a hospital or other place of medical care." 42 Pa.C.S. § 8332(a). In other words, an emergency provider is granted immunity unless that individual's actions amount to intentional harm or gross negligence. The term, "emergency response provider," includes individuals that qualify as "emergency response, emergency medical services personnel, [and] response teams, . . . **excluding** hospital emergency **facilities** and related personnel." 42 Pa.C.S. § 8332(d) (emphases added). We observe that Subsection 8332(d) expressly provides an exclusion for hospital emergency facilities and related personnel. Read in context, the critical word of this exclusion is "facilities" or "facility." In construing the word, "facility," in accordance with its "common and approved usage[,]" one could readily ascertain that the word does not account for modes of transportation, like an ambulance. **See** 1 Pa.C.S. § 1903(a). Additionally, we can also look to the description of the

ambulance at issue, which did not contain a surgical team of physicians and nurses and was not equipped with certain medications like heparin, a blood thinner, or TPA, a clot buster.[26] *See* N.T., 6/16/21, at 9-10; N.T., 6/17/21, at 186. Our conclusion is supported by fact that the general rule specifically states that "an emergency response provider . . . shall not be liable for . . . harm to the person . . . **being moved** to a hospital[.]" 42 Pa.C.S. § 8332(a) (emphasis added).

Moreover, based on the language of the statute, we find that Appellants' contention — that "[n]o reasonable reading of the statute supports the trial court's conclusion that it protects a private hospital from liability arising out of the negligence of its employees" — is misplaced. Appellants' Brief at 32-33. It is clear that the purpose of the Good Samaritan Act is to exclude an ER facility and those personnel working in an ER from immunity in tort liability cases with respect to their medical care. Plainly speaking, the Act was not intended to protect ER facilities from any negligence practices, nor was it intended to protect treating doctors from medical malpractice claims. However, emergency responders, like those that work in ambulances and transport people to a hospital, were provided with immunity protection under the law. Thus, DCMH, acting in its limited role as a provider of emergency

---

[26] It merits mention that TPA was described as a dangerous medication due to its side effects. *See* N.T., 6/17/21, at 83.

ambulatory services, and its emergency responder employees, DCMH EMS, were protected under the Good Samaritan Act.

We also observe that Appellants did not sue DCMH under a theory of direct liability but rather under the concept of vicarious liability. Therefore, their claim against DCMH is derivative of their claim against DCMH EMS. *See Mamalis v. Atlas Van Lines, Inc.,* 528 A.2d 198, 200 (Pa. Super. 1987) ("A claim of vicarious liability depends on the life of the claim from which it derives. Termination of the claim against the agent extinguishes the derivative claim against the principal. Moreover, a claim of vicarious liability is indivisible from the direct claim since both are based on the act or acts of only one tortfeasor.") (citations omitted).

Lastly, to the extent Appellants allege Brown is not entitled to immunity for his "operation or use" of the ambulance based on purported negligent actions like failing to activate the ambulance's lights and sirens, taking a different route to the hospital, stopping and waiting at red lights, and failing to use his horn, we find this argument is misdirected. Appellants' Brief at 36. Indeed, Appellants fail to present any case law that Brown's acts amounted to **gross negligence** like intended instances where an ambulance collides with another vehicle or hits a bystander during transportation. Indeed, the case Appellants reference, *Regester*, does not support their argument for several reasons.

First, **Regester** concerned a different statute, Emergency Medical Services Act,[27] which was repealed in 2009. Second, the **Regester** Court held that a paramedic's failure to follow directions and maintain adequate familiarity with the area did not implicate the vehicle liability exception. **Regester** was previously summarized by our sister court as follows:

> In **Regester**, the [Supreme] Court examined the alleged negligence of paramedics in failing to follow driving directions relayed by the paramedics' dispatch, causing a delayed arrival that proved critical to the inability of the paramedics to revive a decedent. The plaintiffs argued for a rule that would have allowed for all negligent decision-making occurring within the course of the operation of a vehicle to fall within the vehicle exception. The Court noted that its own decisions . . . "establish that the vehicle liability exception encompasses more than merely negligent driving. However, **the Court found that there was no "controlling authority" for the broad rule that "any and all decisions made during the operation of a vehicle implicate the exception." The Court held that the medics' failure to follow directions and maintain adequate familiarity with the area did not implicate the vehicle exception**, stating:
>
> > Here, while properly acknowledging that there is some range of negligence associated with the physical operation of a vehicle beyond actual driving that will implicate the vehicle liability exception, the Commonwealth Court correctly concluded that the form of negligence alleged by the Regesters does not qualify. To the contrary, such allegations of negligence...[are] more closely associated with the public service involved (ambulance service) than it is with the physical operation of the vehicle as such.

**Cornelius v. Roberts**, 71 A.3d 345, 352 (Pa. Commw. 2013) (citations omitted; emphasis added). Therefore, even if we were to apply **Regester** to

---

[27] **See** 35 P.S. § 6931(j)(2) (repealed eff. Aug. 18, 2009).

the present matter, the analysis would find in favor of Brown as his acts were similar to those in **Regester**. According, Appellants' first argument fails.

## IV. Comparative Negligence

Next, Appellants complain the trial court erred by submitting the issue of comparative negligence to the jury. **See** Appellants' Brief at 39. They state:

> Based on [Decedent]'s failure to seek treatment for his gout-like symptoms, the jury found that he was comparatively negligent. The jury also found that [Decedent]'s failure to seek treatment for his gout-like symptoms was a factual cause of him later dying as a result of suffering a pulmonary embolism in his lung. Yet there was no competent testimony showing that [Decedent]'s gout-like symptoms related to his pulmonary embolism. This result cannot stand because Defendants failed to introduce competent expert evidence to support their claim that [Decedent]'s failure to seek treatment for his gout-like symptoms was a factual cause of him later dying from a pulmonary embolism.

*Id.* at 39-40.

Relying on **Pascal v. Carter**, 647 A.2d 231 (Pa. Super. 1994), and **Angelo v. Diamontoni**, 871 A.2d 1276 (Pa. Super. 2005), Appellants contend the "trial court erred in allowing the jury to consider the affirmative defense of comparative negligence in the absence of supporting expert testimony on the issue of medical causation." Appellants' Brief at 40. They maintain that the "determination of whether [Decedent]'s gout-like symptoms were causally related to the pulmonary embolism is beyond the knowledge of a layperson" and Defendants "needed to support their affirmative defense of comparative negligence with competent expert testimony, at least on the

issue of factual causation if not also on the standard of care." ***Id.*** at 45-46. They allege Defendants' two experts did not provide the requisite testimony. ***Id.*** at 48-49.

Furthermore, they argue that Defendants' cross-examination of their own expert witness was insufficient to meet their burden of proof. ***Id.*** at 51-52. Appellants state that the answers given by their expert during cross-examination "were hardly sufficient to meet Defendants' burden of proof [as their] expert stated only that he 'believed' that [Decedent's] knee pain was the 'beginning' of the 'thrombophlebitis' that 'ultimately' led to the pulmonary embolism." ***Id.*** at 53 (emphasis omitted). They contend thrombophlebitis was never defined and the vague terms — "beginning" and "ultimately" — were not given any contextual meaning. ***Id.*** Appellants conclude that because the trial court erred when it submitted the question of comparative negligence to the jury, the judgment in favor of Defendants must be vacated and a new trial on damages only is required. ***Id.*** at 57-58. They state that a "damages only" trial is warranted "because the liability of . . . Arnold has been 'fairly determined'" and the issue of "Arnold's gross negligence is not intertwined with the question of damages." ***Id.*** at 58.[28]

---

[28] In their brief, Appellant also asserted Defendants' counsel did not lay a proper foundation under Pennsylvania Rule of Evidence 705, and "questioned [their] expert on the wrong legal standard of causation[,]" asking about the "increased risk of harm" doctrine. Appellants' Brief at 54. Appellants state the court never instructed the jury on this doctrine, which they claim "allows
*(Footnote Continued Next Page)*

We begin with following:

> As a general proposition, a court should only charge the jury on the law applicable to the factual parameters of a particular case and it may not instruct jury on inapplicable legal issues. More specifically, when there is no evidence of plaintiff's negligence, no instruction to the jury on contributory negligence should be given.

***Boyle v. Indep. Lift Truck, Inc.***, 6 A.3d 492, 495 (Pa. 2010) (citations & quotation marks omitted)

Here, the trial court found the following:

> [Appellants] assert[ ] that "[c]omparative negligence applies only in cases of ordinary negligence of the defendant." [Appellants], however, offer[ ] no caselaw in support of this assertion. The cases cited by [Appellants] involve wanton conduct, analysis of a different statute, or reference the dissent.
>
> The parties agree that this case is not about intentional conduct. Wanton or willful conduct involve intent; comparative negligence is prohibited in such actions. Gross negligence is something less; and there is no such bar when a party has provided evidence to a jury. Comparative negligence was an available defense here.

---

for a lower quantum of proof in some case[;]" rather, it instructed the jury as to factual causation. ***Id.*** at 54-55.

A review of Appellants' Rule 1925(b) concise statement reveals that they did not include this Rule 705 issue in their list of trial court errors. Accordingly, it is waived. **See** Pa.R.A.P.1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b) s]tatement . . . are waived"); ***McKeeman v. CoreStates Bank, N.A.,*** 751 A.2d 655, 658 (Pa. Super. 2000) ("[a]n appellant's failure to include an issue in his [Rule] 1925(b) statement waives that issue for purposes of appellate review").

Trial Ct. Op. at 7-8 (footnotes omitted). We agree with the trial court's

determination that Appellants should not be granted relief on this issue but on

a different basis.[29]

> Comparative negligence is statutorily defined as follows:
>
> In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative **where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought**, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

42 Pa.C.S. § 7102 (a) (emphasis added). "Contributory negligence" is

commonly defined as:

> [C]onduct on the part of a plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm. Contributory fault may stem either from a plaintiff's careless exposure of himself to danger or from his failure to exercise reasonable diligence for his own protection.

***Thompson v. Goldman***, 114 A.2d 160, 162 (Pa. 1955) (citations omitted).[30]

"In addition, a plaintiff's negligent conduct must be a proximate cause of his

_____

[29] ***See Wakeley v. M.J. Brunner, Inc.***, 147 A.3d 1, 5 (Pa. Super. 2016) ("[I]t is well settled that if the court's decision is correct, we may affirm on any ground.").

[30] ***See also Columbia Med. Grp., Inc. v. Herring & Roll, P.C.***, 829 A.2d 1184, 1191 n.7 (Pa. Super. 2003) ("Black's Law Dictionary defines the contributory negligence doctrine as follows: 'The principle that completely bars
*(Footnote Continued Next Page)*

injury if his conduct is to affect his recovery. For negligent conduct to be a proximate cause of an injury, it must be a substantial factual cause of the injury for which damages are sought." ***Zieber v. Bogert***, 747 A.2d 905, 908 (Pa. Super. 2000).

Both comparative negligence and contributory negligence are considered affirmative defenses. ***See*** Pa.R.C.P. 1030(b). "[A]n affirmative defense is not an action, but rather is the statement of new facts and arguments that, if true, will defeat a plaintiff's action." ***Bayview Loan Servicing, LLC v. Lindsay***, 185 A.3d 307, 313 (Pa. 2018). "It is well established that the burden of establishing comparative negligence rests on the defendant. In demonstrating that the plaintiff was negligent, [a] defendant has the burden of showing that his conduct was unreasonable under the circumstances." ***Rose v. Annabi***, 934 A.2d 743, 746-47 (Pa. Super. 2007).

Turning to the matter *sub judice*, Appellants present no case law that states a defendant is required to present its own expert testimony for the causation element of an affirmative defense. Rather, Appellants circumvent the issue by relying on a parenthetical in ***Grossman v. Barke***, 868 A.2d 561 (Pa. Super. 2005) that indicates "generally causation must be established

---

a plaintiff's recovery if the damage suffered is partly the plaintiff's own fault.' Black's Law Dictionary 330 (7th ed. 1999).").

through expert medical testimony[.]" *Id.* at 567, *citing* *Lattanze v*. *Silverstrini*, 448 A.2d 605, 608 (Pa. Super. 1982). *See* Appellants' Brief at 41. We find that *Grossman* is distinguishable from the present matter for several reasons.

Significantly, *Grossman* involved a medical malpractice suit, which is not the same type of case as the case before us, which concerns the treatment and conduct of EMT responders. The *Grossman* Court explained:

> One of the most distinguishing features of a medical malpractice suit is . . . the need for expert testimony, which may be necessary to elucidate complex medical issues to a jury of laypersons.
>
> *    *    *
>
> Indeed, a jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care.

*Grossman*, 868 A.2d at 566-67 (citation & quotation marks omitted). Nevertheless, the *Grossman* Court also recognized that "even in a negligence suit characterized as medical malpractice, **expert testimony is not always required** if the alleged negligence is obvious or within the realm of a layperson's understanding." *Id.* (citation & quotation marks omitted; emphasis added).

Here, the critical issue, which resulted in the comparative negligence jury instruction, concerns whether Decedent's negligence in failing to seek medical attention for his gout-like symptoms was the proximate cause of his death. *See* Appellant's Brief at 39. Timing is of the essence in this issue and

whether a reasonable person in Decedent's place had a duty to seek urgent medical care.  Thus, although Defendants must prove causation, we find that it was permissible for them to do so through the cross-examination of Appellants' expert witness, Carl W. Adams, M.D.[31]

At trial, counsel for Defendants questioned Dr. Adams about Decedent's actions the week prior to the incident:

Q. Let's talk about the time in the week before the event.

[Decedent] had been home with right knee pain for approximately a week; correct?

A. Correct.

Q. And that right knee pain was actually a deep vein thrombosis of his knee; would you agree with that?

A.  Well, his underlying diagnosis was gout, gouty arthritis, but I believe that it was [the] beginning of a thromboembolic -- thrombophlebitis.

Q. And that ultimately led to the clot traveling to his pulmonary arteries; correct?

A. Pulmonary artery on the right; correct.

*     *     *

Q. If [Decedent] had taken his daughter's advice, he would have been at the hospital a complete day in advance; correct?

A. Presumably.  Correct.

Q. And would that have increased his chance of survivability?

_____

[31] The videotaped deposition of Dr. Adams was played to the jury.  ***See*** N.T., 6/15/21, at 98.

A. Correct.

Q. In fact, it would have increased it substantially, would you agree with that?

A. Correct.

Q. And did you read the testimony [of Desiree]?

                    *    *    *

[I]n her testimony, she reported that she had told him that he needed to go to a doctor as early as April 21st, three days before this incident; correct?

A. Correct.

Q. And she remined him again on the 22nd, which was two days before the incident; correct?

A. Correct.

Q. And if he had gone on the 21st or 22nd, is your opinion the same, that he would have had an increase chance of survivability?

A. Correct.

Q. [Desiree testified] that on the 21st [Decedent] said to her that he needed to get out of bed because he was afraid he was going to get a blood clot.

        Do you remember that testimony?

A. I do.  Because he had one before.

Q. And that would indicate [Decedent] himself understood that he could be having a blood clot; correct?

A. Correct.

Transcript of Videotaped Deposition of Carl W. Adams, M.D., 3/31/21, at 57-

60.  Dr. Adams' testimony amounted to a concession that Decedent's knee

pain was the symptom of a blood clot that began one week prior to the incident and he was aware of this potential medical issue. More significantly, Dr. Adams testified that if Decedent had sought treatment a couple days earlier, his chance of survivability would have increased substantially. We find this testimony was more than sufficient to put the issue of Decedent's purported contributory negligence before the jury.[32] *See Boyle*, 6 A.3d at 495.

Furthermore, Appellants' reliance on *Pascal* and *Angelo* is misplaced. In *Pascal*, the plaintiff injured his wrist during a football game. *See Pascal*, 647 A.2d at 232. He visited the defendant-radiologist for x-rays and the defendant "reported that there was no evidence of fracture or abnormality." *Id.* As a result of continued pain, another x-ray was taken and the plaintiff was diagnosed with a fracture. *Id.* He filed a complaint alleging medical malpractice against the defendant. *Id.* A jury returned a verdict in favor of the defendant. *Id.* On appeal, the plaintiff argued he was entitled to a new trial because the trial court erred in charging the jury on contributory negligence. In granting relief to the plaintiff, a panel of this Court explained:

> [The plaintiff] alleged contributory negligence was in failing to seek treatment for [his] injured wrist earlier. [The defendant] argued that if [the plaintiff] had sought treatment for the wrist soon after the initial injury, the treatment could have obviated the need for surgery. There was testimony presented that earlier treatment might have made surgery unnecessary. However,

---

[32] We presume that Defendants did not call their own expert because they were aware that Dr. Adams' deposition would be admitted at trial, and believed his testimony could be used to support their defense.

there was no testimony presented that a proper diagnosis of the fracture could have been made at an earlier date. In fact, the expert testimony indicated that the fracture became clearer over time. Without any evidence demonstrating that an earlier diagnosis would have been successful in discovering [the plaintiff]'s injury, the failure to seek such a diagnosis cannot have been a cause of the need for surgery on the wrist. Moreover, it would be entirely speculative to assume without the benefit of expert testimony on the issue, that simply because it was negligent for [the defendant] to fail to diagnosis the fracture . . ., an earlier diagnosis would have been successful in discovering the injury to the wrist. Thus, as there was no evidence of causation between [the plaintiff's] negligence and the injury alleged, the trial court erred in instructing the jury on contributory negligence.

***Pascal***, 647 A.2d at 233.

We first point out that ***Pascal*** concerned a medical malpractice suit and the alleged negligent acts of the defendant-doctor. That type of liability action is not before us. Moreover, there was no expert evidence regarding the effectiveness of an earlier diagnosis in ***Pascal***. Here, there was expert testimony regarding Decedent's failure to seek medical attention for his gout-like symptoms and causation — albeit from the plaintiff's expert. We emphasize that ***Pascal*** did not address any limitations regarding the use of an opposing party's expert evidence — in other words, it did not rule that a defendant must present its own expert testimony in order to prove comparative or contributory negligence. Thus, ***Pascal*** does not apply to the present matter.

Likewise, Appellants' reliance on ***Angelo*** is misguided. ***Angelo*** also concerned a medical practice suit wherein it was alleged that a physician failed

to diagnose the decedent's Type I diabetes, and the decedent died as a result.

*Angelo*, 871 A.2d at 1278.

> At trial, both parties called expert witnesses to testify concerning the conformity of [the physician's] treatment of [the decedent's] symptoms and condition with the standard of care for family practice physicians. Neither [the defendants] nor the parties' experts testified that [the decedent] failed to comply with medical direction or that he had contributed to his own injuries in any other way. Moreover, the parties stipulated that the defendants would not offer [the physician's] handwritten note suggesting a fasting blood draw to show contributory negligence in exchange for the [the plaintiff-administrator's] agreement not to introduce circumstantial evidence that [the physician] had written the note only after she learned of [the decedent's] death. . . .

*Id.* The jury found the physician was negligent and her negligence was a substantial factor, but the plaintiff had been more than 50% responsible for his own injuries. *Id.* A panel of this Court noted the following:

> [The physician] attempt[ed] to satisfy that standard countering that, notwithstanding the absence from her own case of testimony ascribing contributory negligence to [the decedent], [the decedent's] own expert testified that [the decedent] was obliged to monitor his own health as part of the doctor-patient relationship. [The physician] argue[d] that evidence suggesting [the decedent's] purported lack of diligence in self-monitoring, although slight, enabled the jury to find his actions the cause of his death. . . .

*Angelo*, 871 A.2d at 1281 (citation omitted). The panel concluded:

> The circumstances in this case, however, do not satisfy that second crucial element of the test for contributory negligence. [The decedent] reported his symptoms to [the physician] on two occasions and she responded each time with a diagnosis, albeit erroneous. On neither occasion does the evidence suggest that either [the decedent] or [the physician' treated the visit as routine. In point of fact, [the decedent] appeared at the doctor's office . . . reporting nausea, vomiting, diarrhea, sweating and chills over the prior two hours. This factor negates the suggestion

that [the decedent] breached a duty in failing to report his symptoms. Moreover, [the decedent] left each visit assured of a diagnosis by a medical professional who was ostensibly more knowledgeable than he under the circumstances, and on whose expertise he was entitled to rely[.] His questions had been asked and answered and his duty as a patient satisfied. . . .

* * *

Having concluded that the record does not offer sufficient evidence to allow a charge to the jury on contributory negligence, we need only discern whether the charge provided here "probably misled" the jury. Under the circumstances at hand, we do so without hesitation. . . .

*Id.* 1281-82 (citations omitted). We note that *Angelo* concerned a sufficiency of the evidence argument — whether there was sufficient evidence to show the plaintiff breached his duty to report his symptom — as opposed to whether a party is required to present expert testimony. Therefore, it does not control the present case. Accordingly, Appellants' second claim fails.

## V. Weight of the Evidence

In Appellants' third issue, they claim the jury's allocation of fault between Decedent and Arnold was against the weight of the evidence. Appellants' Brief at 59-60. They state the "problem with the jury's verdict is patent" where the trial court instructed the jury on gross negligence. *Id.* Appellants argue that while the jury found that Arnold's conduct amounted to gross negligence and Decedent's conduct constituted ordinary negligence, it "inexplicably allocated more fault to [Decedent] than it did to" Arnold. *Id.* at 60. They insist that "[s]imple logic compels" a conclusion that the verdict was

against the weight of the evidence based on the court's definition of gross

negligence. *Id.*

When presented with a challenge to weight of the evidence claim, our standard of review is well-settled.

Initially, we note the following relevant legal precepts:

Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court may award a judgment notwithstanding the verdict or a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. When a fact finder's verdict is so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion, it can be said that the verdict is shocking.

However, [i]f there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we

must affirm. An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party.

*McFeeley v. Shah*, 226 A.3d 582, 594 (Pa. Super. 2020) (citations and quotation marks omitted).

*Spencer v. Johnson*, 249 A.3d 529, 566 (Pa. Super. 2021).

In disposing of Appellants' weight claim, the trial court explained:

This point of error can be interpreted two ways: the verdict goes against the weight of the evidence, or there is an inconsistency in the jury's answer. If the latter, this issue was not preserved at trial and is, therefore, waived.

\* \* \*

The court did not find that the verdict was against the weight of the evidence. [Defendants] elicited testimony from [Appellants] and witnesses that . . . Decedent was exhibiting signs and symptoms that warranted immediate medical attention and that . . . Decedent failed to seek medical treatment, even against the suggestion of his family.

Trial Ct. Op. at 10-11 (footnotes omitted).

To the extent that Appellants raise an inconsistent verdict challenge, as their argument does intertwine suggestions of a discrepancy in the jury's decision, we agree with the trial court that they have waived this claim. *See* Pa.R.A.P. 302(a).

We now turn to the merits of Appellants' weight argument. "We are reminded that it is not the place of this Court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function." *Spencer*, 249 A.3d at 569 (citation omitted).

A review of the record reveals the following. The trial testimony established that Decedent had a prior history of blood clots in his legs. ***See*** N.T., 6/15/21, at 116. One week prior to the April 24th incident at issue, Decedent was suffering from such knee pain and difficulty walking that he decided to stay home from work. ***See*** N.T., 6/14/21, at 173. Two of his family members suggested to him that he contact his treating physician, including his gout doctor, but he declined to do so. ***See*** N.T., 6/14/21, at 174; N.T., 6/15/21, at 124-125. As mentioned above, on the morning of April 24th, Decedent collapsed on his basement steps and DCMH EMS responded to the 9-1-1 call. ***See*** N.T., 6/16/21, at 13.

Based on the circumstances, Defendants presented evidence that Arnold asked one of Decedent's daughter about his medical history. ***See*** N.T., 6/14/21, at 104-105, 134. When Decedent told DCMH EMS he was having trouble breathing, they conducted an EKG test and provided him with oxygen. ***See*** N.T., 6/14/21, at 134; N.T., 6/16/21, at 25; N.T., 6/17/21, at 144. Arnold then placed a defibrillator monitor, a peripheral catheter, and an EKG monitor on Decedent. ***See*** N.T., 6/22/21, at 33-35. They also gave Decedent chewable baby aspirin at approximately 11:30 a.m. ***See id.*** at 36-37. Two minutes later, Arnold took a set of Decedent's vital signs, and noted that Decedent's rapid heart rate had decreased and his oxygen saturation was improving. ***See id.*** at 38.

Arnold made the decision to take Decedent to Lankenau based on his symptoms and the medical equipment available at the hospital, but when they were three to four minutes away, Decedent went into cardiopulmonary arrest. *See* N.T., 6/16/21, at 34, 55-56, 78; N.T., 6/22/21, at 39-40. Arnold ordered Brown to stop the vehicle so that he and Brown could administer CPR. N.T., 6/14/21, at 153; N.T., 6/16/21, at 34. During this time, while they were administering compressions and giving epinephrine, Casey arrived to assist. *See* N.T., 6/14/21, at 155; N.T., 6/22/21, at 43. They then performed an orotracheal intubation of Decedent, and conducted another rhythm check on Decedent, who was "in asystole[,]" so they restarted doing compressions while giving him more epinephrine. N.T., 6/22/21, at 44-45. They then resumed transporting him to Lankenau. *Id.* at 45.

As mentioned above, approximately 39 to 40 minutes had elapsed from the time DCMH EMS arrived at Decedent's home to when they arrived at the hospital. *See* N.T., 6/16/21, at 77. The jury heard testimony from Casey, who indicated that the time period was "reasonable" for someone who is exhibiting signs of a pulmonary embolism to get to the hospital. *See id.* at 112.

Defense witness, Gregory C. Kane, M.D., an expert in the areas of, *inter alia*, pulmonary medicine, myocardial infarction, the performance of diagnostic testing, the performance of CPR and resuscitation, and the transit of patients by ambulance crews from the field into the hospital, testified at

trial. *See* N.T, 6/17/21, at 56. He stated DCMH EMS's "actions were within the standard of care for what [his] expectation was and [his] awareness of the Pennsylvania guidelines for providing EMS support, both BLS and ALS, of [Decedent] in his transport" to Lankenau. *Id.* at 67. Dr. Kane testified that Decedent's blood clot was "large" and "it led him to have a cardiac arrest while being transported to the hospital." *Id.* at 81. The expert disagreed with Appellants' expert, Dr. Adams, about Decedent's medical history and that it automatically meant he was going to have a pulmonary embolism. *Id.* at 86-87. Dr. Kane indicated one can have a heart attack even if that person had a prior DVT. *Id.* at 86. He opined:

> [W]e have to remember that we still don't know that there's pulmonary embolism at the time that [Decedent] has his arrest, so if the ambulance had not stopped to do appropriate CPR — which is the standard in our field when a patient has arrest, to start CPR right away — they would have arrived in the emergency room without an understanding of what the condition was and would have needed to do some of those diagnostic studies to understand it.
>
> We've also seen that the surgeon had difficulty placing the ECMO, was unable to place the ECMO in the emergency room, so my opinion is that [Decedent] would not have survived even if the ambulance crew had just continued driving directly to the hospital.

*Id.* at 88-89.

When asked "how far in advance would [Decedent] have had to have arrived in the hospital to have a chance[,]" Dr. Kane responded:

> I would have estimated that had [Decedent] called for fire rescue an hour earlier, perhaps, he could have gotten to the emergency room in time, or they could have done some of the diagnostic work

to figure out he had a [pulmonary embolism] and administer some of these life saving treatments that we've discussed.

N.T, 6/17/21, at 89.

The expert also stated that Arnold's request for information regarding Decedent were "routine questions that you would expect the EMTs to ask so they could make the best decision to take the patient and a little bit about what he would need as part of his report for transport." N.T, 6/17/21, at 91. Furthermore, he opined that when Brown stopped the ambulance to help Arnold perform CPR, this was reasonable because

> [t]wo-person CPR is highly effective, [it] gives [a responder] a chance to vent late, give the patient additional oxygen for breathe for the patient if they're not breathing, also in this case insert an endotracheal tube to gain access to lungs, provide high levels of oxygen and also enables somebody to do effective chest compressions, which would be very difficult to do in a moving ambulance, particularly going around corners.

*Id.* 92-93.

The jury also heard from defense witness, James P. McCans, an expert in EMT paramedic care, CPR, and operations of the vehicle,[33] who testified that DCMH EMS's ambulance operation and care and treatment rendered met the applicable standard of care. *See* N.T., 6/17/21, at 133-34. He noted that Pennsylvania "has adopted a less [ambulance] lights and sirens model for EMS response." *Id.* at 137. Moreover, McCans indicated it was standard to "assess the environment[,] talk to the patient, have communication with the patient's

---

[33] *See* N.T., 6/17/21, at 129.

family, build a story as to what's occurring[.]" *Id.* at 139. The expert testified that "[o]ne of the first signs of a cardiac issue is having trouble breathing because [the] respiratory system will try to compensate for deficiency on the cardiac side" and DCMS EMS was "following protocol" when they provided Decedent with oxygen and aspirin. *Id.* at 143-44. McCans stated it was a "totally appropriate" amount of time that they spent at Decedent's residence. *Id.* at 147. McCans mentioned he was familiar with the area and testified it was a "reasonable route" for Brown to take to Lankenau and that responders "don't have the right or the permission by the state to just blow through a red light or a stop sign." *Id.* at 149-50. He also indicated that they need to "[a]void potholes" and "sudden accelerations and decelerations" while responders are in the back doing CPR. *Id.* at 167.

Additionally, McCans stated DCMH EMS were "following the American Heart Association's advance cardiac life support protocol." N.T., 6/17/21, at 204. He testified that because Decedent went "into a flat line rhythm[,]" they could not use a defibrillator and needed to do CPR. *Id.* at 156. He noted that Pennsylvania "actually recommends that during pit crew CPR[,] the second person is set up on the other side of the patient and [does] a minute on, a minute off, swap back and forth [for] efficacy[.]" *Id.* at 157. McCans opined that the decision to pull over and start two-person CPR is not addressed in the EMS protocols and that it would be up to the paramedic and "his gut response as to what to do, and if that was to occur at that point[.]" *Id.* at 200-201.

McCans stated that his practice — and what he tells young medics — is that if he can hold his breath to get to the hospital, "then [he would] continue on" but if he cannot, then he suggests stopping to conduct CPR. *Id.* at 201. He commented that DCMH "worked very hard to save [Decedent's] life" and they "did not increase any harm to him." *Id.* at 172-73.

Appellants did not call their EMS expert to testify at trial. *See* N.T., 6/17/21, at 5. As mentioned above, their other expert, Dr. Adams, conceded that Decedent's change of survivability would have increased if he sought treatment earlier.

In considering these circumstances, we cannot conclude the trial court abused its discretion in refusing to grant a new trial. We recognize that gross negligence involves a higher degree of deviation from the standard of care than ordinary negligence. *See Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 19 (Pa. 2019). However, that does not necessarily equate to a greater amount of liability. Appellants present no case law to suggest that the legal weight or ramifications of gross negligence and ordinary negligence creates a scenario where the former trumps the latter in terms of outcomes. Thus, while the jury did find Arnold's actions amounted to gross negligence, it could reasonably determine that Decedent's liability in his failure to seek treatment greatly outweighed Arnold's liability. "We reiterate it was solely for the [jury], as the finder of fact, to determine the credibility of witnesses and to resolve any conflicts or inconsistencies in the evidence. The jury was free to accept

all, some, or none of the testimony presented to them." *Spencer*, 249 A.3d at 571 (citations & quotation marks omitted). Thus, we conclude the trial court did not abuse its discretion in determining that the verdict was not against the weight of the evidence. Accordingly, Appellants' weight claim merits no relief.

### VI. Negligent Infliction of Emotional Distress

In their final argument, Appellants assert the trial court erred by granting a compulsory nonsuit on Briannah's claim for NIED. Appellants' Brief at 61.

> The standard of review on appeal from the denial of a motion to remove a compulsory nonsuit is as follows:
>
> > The plaintiff must be allowed the benefit of all favorable evidence and reasonable inferences arising therefrom, and any conflicts in the evidence must be resolved in favor of plaintiff. Further, [i]t has been long settled that a compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established. However where it is clear a cause of action has not been established, a compulsory nonsuit is proper. We must, therefore, review the evidence to determine whether the order entering judgment of compulsory nonsuit was proper.

*Braun v. Target Corp.*, 983 A.2d 752, 764 (Pa. Super. 2009) (citation omitted).

In addressing this issue, we are guided by the following:

> As explained in *Doe v. Philadelphia Community Health Alternatives AIDS Task Force,* 745 A.2d 25, 26 (Pa. Super. 2000), *aff'd,* 564 Pa. 264, 767 A.2d 548 (2001), the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff

was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) **the plaintiff observed a tortious injury to a close relative.**

When proceeding under this theory, a unanimous panel of this Court observed that

> [t]he **crux** of a negligent infliction of emotional distress claim is that **appellees breached some duty they owed to appellant and that that breach injured her**.

**Denton v. Silver Stream Nursing and Rehabilitation Center,** 739 A.2d 571, 578 (Pa. Super. 1999) (although Judge McEwen, P.J.E., filed a concurring and dissenting statement, he joined in the quoted section).  Therefore, under this theory of recovery, **a plaintiff must establish the elements of a negligence claim, "i.e., that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage**."

**Toney v. Chester Cty. Hosp.**, 961 A.2d 192, 197-98 (Pa. Super. 2008) (e*n banc*) (some citations omitted; emphasis added).  After a petition for allowance of appeal was granted in **Toney**, the Pennsylvania Supreme Court, in an evenly-split plurality decision,[34] discussed NIED under "special relationship theory," stating:

> Before 1970, our Court abided by the century-old common law "impact rule" in cases involving emotional distress claims.  The impact rule "barred recovery for fright, nervous shock or mental or emotional distress unless it was accompanied by a physical injury or impact upon the complaining party." **Kazatsky v. King David Memorial Park, Inc.**, 515 Pa. 183, 527 A.2d 988, 992 (Pa. 1987); **see also, Potere v. City of Philadelphia**, 380 Pa. 581, 112 A.2d 100, 104 (Pa. 1955).  We acknowledged that the "common law rationale for the impact rule is embodied in the

---

[34] We recognize that that while **Toney** is persuasive, it is not binding.

often-quoted statement of Lord Wensleydale in ***Lynch v. Knight***, 9 H.L.Cas. 557, 598, 11 Eng.Rpts. 854, 863 (1861): 'Mental pain or anxiety the law cannot value, and does not [pretend to] redress, when the unlawful act complained of causes that alone.'" ***Id.***; ***see also***, W. Page Keeton et al., ***Prosser and Keeton on the Law of Torts***, § 12, at 55 (5th ed. 1984). In ***Kazatsky***, we further catalogued the concerns regarding recovery for psychic injury as including "medical science's difficulty in proving causation, the danger of fraudulent or exaggerated claims, and the perception that recognition of such a cause of action would precipitate a flood of litigation." ***Id.***

We did not diverge from the impact rule until ***Niederman v. Brodsky***, 436 Pa. 401, 261 A.2d 84 (Pa. 1970), when we adopted the "zone of danger" theory of NIED liability, which provided compensation to those who did not actually suffer a physical impact resulting in emotional distress so long as they were in personal danger of the physical impact. We concluded that the fear of impact resulted in justifiable and compensable emotional distress. The Court in ***Niederman*** allowed this extension of liability, in part, based upon the evolution of medical science's ability to diagnose mental distress. ***Id.*** at 86.

The most recent step in the evolution of NIED occurred in ***Sinn v. Burd***, 486 Pa. 146, 404 A.2d 672 (Pa. 1979), where we adopted the theory of bystander liability. **The adoption of the bystander liability theory of NIED allowed recovery for emotional distress for plaintiffs who witnessed an accident causing serious injury to a close family member, even if the plaintiff was not within the zone of danger of physical impact.** As explained in ***Sinn***, we limited recovery for serious mental distress to situations "where a reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event." ***Id.*** at 683 (internal quotations marks omitted). . . . Later, in ***Mazzagatti v. Everingham***, 512 Pa. 266, 516 A.2d 672 (Pa. 1986), we refused to extend bystander liability where a plaintiff did not immediately witness the traumatic event, but instead came upon the scene later.

***Toney v. Chester Cty. Hosp.***, 36 A.3d 83, 88-89 (Pa. 2011) (emphasis added).

Turning to Appellants' arguments, they claim that certain **Sinn** "factors" were disputed at trial. **See** Appellants' Brief at 62. They state Briannah's "observations of Defendants' lack of urgency and care for her father, while he was unable to breathe, satisfies the 'observation' requirement." **Id.** at 63. They allege she witnessed Arnolds' and Brown's negligent acts at her house, *en route* to the hospital (where the responders stopped at the red lights and pulled over to administer CPR to Decedent), and at the hospital (where Arnold or Brown told her that everything would be okay). **Id.** at 65-70. They assert that because of her distress as result of the actions of Arnold and Brown, she had to move out of her family's home and live with her grandmother, as well as seek mental health services. **Id.** at 71-72. Appellants contend the trial court "incorrectly asserted that the claim for [NIED] was based only on the conduct of" Brown. **Id.** at 73. They maintain the claim also included the conduct of Arnold. **Id.** They also suggest the court "improperly focused on only the following four allegations pertaining to . . . Brown: (1) driving in the wrong direction; (2) failing to use lights and sirens; (3) waiting for the traffic lights to turn green; and (4) not using the horn." **Id.** They conclude Briannah's NIED claim "was based on much more than 'a driver operating an ambulance in compliance with the laws.'" **Id.** at 74.

In finding no relief was warranted on the NIED cause of action, the trial court explained:

> [Briannah] provided that her "claim is not based on the nature of care. It's not based on whether they did an EKG[.]"

[Her] claim of [NIED] is based on a delay caused by the ambulance travelling in the "wrong" direction, a failure to employ lights and sirens during transport, waiting for the traffic lights to turn green prior to entering an intersection, and not using the horn.

\*    \*    \*

[Appellants] argued that had the driver taken a different route, the trip would taken six to eight minutes. However, the patient went into cardiac arrest four minutes into the transport at 11:38 a.m. According to the parties, the ambulance was parked for 15 minutes for care[.] Transportation resumed at 11:53 a.m. The ambulance arrived at the hospital three minutes later, 11:56 a.m. Based upon [Briannah]'s testimony, the transport took seven minutes.

Pennsylvania statute, 75 Pa.C.S. § 7105(d), provides that "[t]he driver of an ambulance . . . shall comply with maximum speed limits, red signal indications and stop signs. After ascertaining that the ambulance . . . will be given the right-of-way, the driver may proceed through a red signal indication or stop sign." As to the manner of transport, the court cannot find that a driver operating an ambulance in compliance with the laws amounts to a breach of duty. Based upon the evidence presented, the court found that [Briannah] failed to establish a cause of action for [NIED].

Trial Ct. Op. at 8-10 (footnotes omitted).

We agree with the trial court's analysis and affirm on its basis while adding the following, additional commentary. Contrary to Appellants' argument, at trial, their counsel argued that Briannah's claim "is based on a 23-minute window of time while she was in the ambulance, and just before she got into the ambulance, she observed her dad in a critically ill state where he could not move and he kept saying I can't breathe[.]" N.T., 6/17/21, at 14-15. Their counsel previously had stated:

> Our claim has nothing to do with the care. [Briannah is] in no position to judge whether the care they gave him was negligence. Her claim has to do with the fact that they made a series of mistakes in driving to the hospital, not using lights and sirens. That's the evidence.

N.T., 6/14/21, at 17. We note that it is clear that a NIED cause of action has not been established as Briannah failed to present any evidence that Defendants owed a duty of care to her or that they breached that duty. **_See Denton_**, 739 A.2d at 578. Rather, Briannah's NIED claim amounted to an allegation that DCMH EMS were not acting with urgency and made a few traffic errors. Moreover, as Defendants point out:

> [Appellants] failed to come forward with any evidence to establish that her alleged distress was directly caused by . . . Brown's ambulance drive. Beyond feeling anxious because her father was in the ambulance and she wanted the ambulance to hurry, . . . Briannah . . . offered no testimony regarding any discrete, identifiable, action or event of the manner in which the ambulance drove which specifically caused her emotional distress.

Defendants' Brief at 41. Accordingly, Appellants' final claim fails.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/20/2023